AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
## for the
### Central District of California

United States of America

v.

RIGOBERTO MORENO-MACHUCA and
OLIVER RANGEL-ARMENTA,

Defendant(s)

Case No. 2:21-mj-04975-DUTY

**LODGED**
CLERK, U.S. DISTRICT COURT
10/28/21
CENTRAL DISTRICT OF CALIFORNIA
BY: ___RO___ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT
10/28/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: ___clee___ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of October 27, 2021, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
| --- | --- |
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Kyle Hegarty*
*Complainant's signature*

Kyle Hegarty, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: October 28, 2021

_____
*Judge's signature*

City and state: Los Angeles, California

Hon. Steve Kim, U.S. Magistrate Judge
*Printed name and title*

AUSA: Maxwell Coll – 213-894-1785

## AFFIDAVIT

I, Kyle Hegarty, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1.  This affidavit is made in support of a criminal complaint and arrest warrants against Rigoberto MORENO-MACHUCA ("MORENO-MACHUCA") and Oliver RANGEL-ARMENTA ("RANGEL-ARMENTA") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2.  This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES"), in the custody of the Drug Enforcement Administration in Los Angeles, California, as described more fully in Attachment A:

    a)  One black MaxWest flip cellphone, booked as non-drug exhibit N-26 under case number R1-20-0079 ("SUBJECT DEVICE 1");

    b)  One Android cellphone, booked as non-drug exhibit N-27 under case number R1-20-0079 ("SUBJECT DEVICE 2"); and

    c)  One black MaxWest flip cell phone, booked as non-drug exhibit N-25 under case number R1-20-0079 ("SUBJECT DEVICE 3").

3.  The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject

Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrants, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5. I am a Special Agent ("SA") with the United States Drug Enforcement Administration ("DEA") and have been so employed since March of 2019. The DEA is responsible for investigating Title 21 crimes, including the activities of both national and international drug trafficking organizations. I am currently assigned to the DEA's Los Angeles Field Division, High Intensity Drug Trafficking Area Group 51 ("HIDTA 51"). HIDTA 51 investigates large-scale drug organizations operating in the Southern California area and elsewhere. I received 16 weeks of narcotics law enforcement training at the DEA Basic Agent Training at the DEA Academy, Quantico, Virginia. Through the DEA Academy and continuing education, I have received extensive training on conducting federal narcotics investigations, investigative techniques, conducting undercover operations,

interviewing witnesses and subjects, developing sources, and search and seizure of evidence, among other things.

6. Between June of 2013 and March of 2019, I was employed as a police officer with the East Hartford Police Department in Connecticut. I conducted local narcotics investigations as an investigator with the Vice, Intelligence, and Narcotics unit, resulting in the arrest and prosecution of numerous drug traffickers and violent offenders.

7. Based on this training, experience, and conversations with other narcotics investigators, I am familiar with drug traffickers' methods of operation including the distribution, storage, and transportation of drugs, as well as the collection of drug proceeds and methods of money laundering used to conceal the nature of the proceeds. I have received training and collaborated with other law enforcement officers regarding the unlawful importation, possession, and distribution of controlled substances. Based on this experience and work with other law enforcement agents, I am familiar with public corruption statutes and money-laundering statutes involving the proceeds of specified unlawful activities and conspiracies associated with criminal narcotics, in violation of Titles 18 and 21 of the United States Code. I also speak regularly with narcotics investigators at the federal, state, and local level, as well as drug traffickers and informants, regarding the manner in which drug traffickers store, sell, and transport narcotics.

## III. SUMMARY OF PROBABLE CAUSE

8. During the month of October 2021, a confidential source ("CS") conversed with an individual using a Mexican phone number about purchasing 6 kilograms of fentanyl in Los Angeles, California. Specifically, in audio-recorded phone calls, CS communicated with an individual who used a Mexican phone number ending in 2004 (the "broker"). The broker agreed that CS would receive 6 kilograms of fentanyl on credit and pay for the drugs after they were resold. The broker coordinated with CS to transfer 6 kilograms of fentanyl to CS on or around October 27, 2021, in Diamond Bar, California.

9. On or around October 27, 2021, the broker connected CS with the broker's source of supply in Los Angeles. That morning, CS received a phone call from a telephone number ending in 1092. The caller identified himself in Spanish as calling on behalf of the broker and stated to CS that they needed to meet in order to provide CS the "tools." CS then received a text message from the number ending in 1092 providing an address on Gold Rush Drive in Diamond Bar, California (hereinafter the "Gold Rush Address").

10. At approximately 5:00 p.m. on or around October 27, 2021, CS, followed closely by investigators, drove to the Gold Rush Address. Near the Gold Rush Address, Task Force Officer ("TFO") Pena observed an older model red Ford Explorer parked on the street. TFO Pena had observed the driver, a Hispanic male, approximately 35 years old with a beard, speaking on a cellphone. TFO Pena then observed a dark gray Honda Pilot,

4

California license plate number 5YFB580, drive past the red Explorer. The red Explorer pulled away from the curb line and drove out of the area. Simultaneously, CS pulled in front of the Gold Rush Address, and the Honda Pilot conducted a U-turn and parked on the South curb line. A Hispanic male, later identified as MORENO-MACHUCA, exited the front passenger seat of the Honda Pilot and walked towards CS. The Honda Pilot, operated by a Hispanic male later identified as Oliver RANGEL-ARMENTA, drove out of the area.

11. MORENO-MACHUCA attempted to enter CS's car and told CS the fentanyl was in the Honda Pilot. When MORENO-MACHUCA stepped away from CS's vehicle and appeared to make a phone call, CS called investigators and advised them that the fentanyl was inside the Honda Pilot. Moments later, the Honda Pilot pulled up next to MORENO-MACHUCA, who flailed his arms and signaled for the vehicle to keep driving. At this time, I believed the two men had spotted surveillance vehicles and knew of police presence.

12. Subsequently, agents detained MORENO-MACHUCA on foot without incident. I observed MORENO-MACHUCA attempt to place a cellphone in his right jacket pocket (SUBJECT DEVICE 1), and I recovered a second Android phone from his right jacket pocket (SUBJECT DEVICE 2). HIDTA 51 investigators and LAPD air support maintained surveillance of the Honda Pilot as it traveled East bound on Golden Springs Drive towards Diamond Bar Boulevard. Assisting uniform LAPD K9 Officers Suviate and Delrio conducted a vehicle stop of the Honda Pilot on Golden Springs Drive and

took the driver, RANGEL-ARMENTA, into custody without incident. TFO Al Vicencio located a black MaxWest flip phone in RANGEL-ARMENTA's rear pants pocket (SUBJECT DEVICE 3).

13. Officers read RANGEL-ARMENTA his Miranda rights. After admonishments, RANGEL-ARMENTA consented to a search of the vehicle. LAPD K9 Officer D. Suviate also deployed her narcotics detection K9 in the area of the vehicle. Her K9 alerted to the presence of illegal drugs inside the vehicle. In the front passenger floorboard of the vehicle was a blue Bud Light box. Inside the box, TFO Do discovered six rectangular, brick-like packages wrapped in black tape marked "TREVOL YERNO" in black lettering. Based on my experience, the packaging was consistent with the packaging of illegal drugs. The suspected fentanyl had an approximate weight, including packaging, of 8.25 kilograms. Due to the dangers of contact with fentanyl, the Drug Enforcement Administration did not field test illegal drugs. The suspected drugs will be transported to the DEA laboratory for testing.

## IV. STATEMENT OF PROBABLE CAUSE

14. Based on my review of law enforcement reports, my personal observations, my review of the evidence, and my conversations with other law enforcement officers who were involved in this investigation and a confidential source (the "CS")[1], I am aware of the following:

---

[1] CS has cooperated with the DEA since 2019. Since that time, CS has provided information for over 15 investigations, both foreign and domestic, including many involving drug and
(footnote cont'd on next page)

### A. In October 2021, a Mexico-based Source of Supply Coordinates the Sale of Fentanyl in Los Angeles County

15. During the month of June 2021, members of the HIDTA Group 51 began investigating a Sinaloa, Mexico-based fentanyl source of supply (the broker). Throughout the course of the ongoing investigation into the broker's Drug Trafficking Organization, HIDTA 51 investigators have seized approximately 17 kilograms of fentanyl.

16. During the month of October 2021, CS communicated with the broker by phone. The broker used a Mexican phone number ending in 2004. Through numerous recorded phone calls, CS coordinated the acquisition of approximately 6 kilograms of fentanyl in Los Angeles, California. The broker agreed that CS would receive approximately 6 kilograms of fentanyl on credit and pay for the drugs after they were resold. CS coordinated with the broker to pick up the approximately 6 kilograms of fentanyl on or around October 27, 2021.

### B. The Broker Connects CS with a Los Angeles-Based Source of Supply to Transfer 6 Kilograms of Fentanyl

17. On or around October 27, 2021, the broker connected CS with a Los Angeles-based source of supply.

18. Specifically, at approximately 11:14 a.m. on or around October 27, 2021, CS received a phone call from a telephone number ending in 1092, followed by subsequent phone calls from the same number. During the phone calls, a Spanish-speaking

---

firearm seizures. The information provided by CS has been corroborated and has been proven to be reliable. CS has been convicted of a drug trafficking offense in the United States. CS is working with the DEA for financial compensation.

male confirmed that he was calling CS on behalf of the broker. The man said to CS that they needed to meet so he could give CS the "tools."

19. At approximately 11:17 a.m. on or around October 27, 2021, CS received a text message from the phone number ending in 1092. The text message provided CS with an address in Diamond Bar, California (the Gold Rush Address).

20. At approximately 4:00 p.m. on or around October 27, 2021, investigators met with CS in Los Angeles, California. At the location, I searched CS's person and vehicle for the presence of weapons, contraband, and extra currency. The search was negative. CS was then outfitted with an audio and video recording device.[2] Followed closely by investigators, CS traveled to the parking lot of a restaurant located at 205 South Diamond Bar Boulevard, Diamond Bar, California.

21. At approximately 4:33 p.m. on or around October 27, 2021, CS called the phone number ending in 1092 while CS was in the parking lot. CS spoke with a Spanish-speaking male, who advised CS that the male would not travel to the restaurant, and that CS would need to meet at the Gold Rush Address. The man advised CS that he did not live at the Gold Rush Address and that they could complete the drug transaction in the street.

---

[2] While the video-recording device did function during the subsequent events, the audio-recording did not function properly and audio was thus was not captured.

8

### C. CS Meets MORENO-MACHUCA Near the Gold Rush Address and Discusses the Transfer of 6 Kilograms of Fentanyl

22. At approximately 4:42 p.m. on or around October 27, 2021, TFO Servando Pena was positioned on surveillance in front of the Gold Rush Address. TFO Pena observed an older model red Ford Explorer park on the street in front of the address. TFO Pena observed the driver, a Hispanic male, approximately 35 years old, with a beard, in the driver's seat. TFO Pena observed the man on a cellphone. TFO Pena noted the residential street was quiet with little to no traffic. TFO Pena suspected the man was involved in the drug transaction due to his proximity to the Gold Rush Address.

23. At approximately 4:52 p.m. on or around October 27, 2021, CS placed another phone call to the telephone number ending in 1092. TFO Pena again observed the driver of the red Ford Explorer speaking on a cellphone.

24. At approximately 5:00 p.m. on or around October 27, 2021, CS began driving to the area of the Gold Rush Address. TFO Pena observed a dark gray Honda Pilot, California license plate number 5YFB580, drive past the red Explorer. The red Explorer then pulled away from the curb line. Simultaneously, CS pulled in front of the Gold Rush Address, and the Honda Pilot conducted a U-turn and parked on the South curb line.

25. A Hispanic male, later identified as Rigoberto MORENO-MACHUCA, exited the front passenger seat of the Honda Pilot and walked towards CS. The Honda Pilot, operated by another

9

Hispanic male, later identified as Oliver RANGEL-ARMENTA, drove away East bound on Gold Rush Drive, out of the area.

26. CS spoke with MORENO-MACHUCA, who initiated a conversation. I conducted a debrief with CS following the operation. CS stated to me that MORENO-MACHUCA told CS he did not want to do the deal in the area because there were too many cameras. CS stated to me that MORENO-MACHUCA tried to enter CS's vehicle. CS did not allow MORENO-MACHUCA to enter the vehicle. CS stated to me that MORENO-MACHUCA told CS to follow him and the Honda Pilot because they had the kilograms of fentanyl in the vehicle. CS stated to me that MORENO-MACHUCA then stepped away from the vehicle to place a phone call. At this time, CS called SA Hegarty and SA Mendoza and advised them that MORENO-MACHUCA had indicated the fentanyl was inside the Honda Pilot.

27. At approximately 5:05 p.m. on or around October 27, 2021, TFO Pena observed MORENO-MACHUCA step away from CS's vehicle and begin speaking on his cellphone while walking West bound on Gold Rush Drive. A HIDTA 51 surveillance vehicle drove past MORENO-MACHUCA, and MORENO-MACHUCA began walking at a faster pace. Moments later, the Honda Pilot reappeared, operated by RANGEL-ARMENTA. The vehicle pulled next to MORENO-MACHUCA as if to pick him up. MORENO-MACHUCA flailed his arm and signaled for the vehicle to keep driving West bound on Gold Rush Drive. I believed the two men had spotted surveillance vehicles and knew of the police presence.

### D. Agents Detain MORENO-MACHUCA and Seize SUBJECT DEVICE 1 and SUBJECT DEVICE 2

28. At this time, I decided to detain MORENO-MACHUCA. SA Mendoza and I detained MORENO-MACHUCA on foot without incident. While detaining MORENO-MACHUCA, I observed MORENO-MACHUCA try to stuff a black Max West flip phone (SUBJECT DEVICE 1) in his right jacket pocket. I recovered a second Android phone (SUBJECT DEVICE 2) from his right jacket pocket.

### E. Law Enforcement Officials Conduct a Vehicle Stop of the Honda Pilot and Seize Bricks of Apparent Fentanyl

29. HIDTA 51 investigators and assisting LAPD air support maintained constant surveillance of the Honda Pilot as it traveled East bound on Golden Springs Drive towards Diamond Bar Boulevard. Assisting uniform LAPD K9 Officers Suviate and Delrio conducted a vehicle stop on Golden Springs Drive, east of Diamond Bar Boulevard. The driver, RANGEL-ARMENTA, was taken into custody without incident. When taken into custody, TFO Al Vicencio located a black Max West flip phone in RANGEL-ARMENTA's rear pants pocket (SUBJECT DEVICE 3).

30. Group Supervisor ("GS") Robert Quezada admonished RANGEL-ARMENTA of his Miranda rights. GS Quezada and TFO Duarte spoke with RANGEL-ARMENTA moments later. This conversation took place in Spanish and was recorded. GS Quezada asked if there was anything in the car and RANGEL-ARMENTA stated he was given a box to give to someone but did not know what was inside. TFO Duarte asked for consent to search the vehicle and RANGEL-ARMENTA responded yes.

31. LAPD K9 Officer Suviate deployed her narcotics detection K9 in the area of the vehicle. Her K9 alerted to the presence of illegal drugs inside the vehicle. TFO Vinh Do took photographs of the vehicle and subsequently conducted a search. In the front passenger floorboard of the vehicle was a blue Bud Light box. During a search of the Bud Light box, TFO Do found six rectangular, brick-like packages wrapped in black tape and marked "TREVOL YERNO" in black lettering. Based on my training and experience, the packaging was consistent with the packaging of kilograms of illegal drugs.

32. TFO Pena and I transported MORENA-MACHUCA to the area of the vehicle stop. SA Mendoza admonished MORENA-MACHUCA of his Miranda rights. MACHUCA-MORENO stated that RANGEL-ARMENTA was a friend and provided vague answers to questions. RANGEL-ARMENTA then requested an attorney. RANGEL-ARMENTA and MORENA-MACHUCA were temporarily transported to HIDTA and subsequently held at the Montebello Police Department.

### F. Agents Take Custody of Suspected Fentanyl and the SUBJECT DEVICES

33. I took custody of the suspected fentanyl and other evidence and transported it to HIDTA for processing. The suspected fentanyl had an approximate aggregate weight of 8.25 kilograms, including packaging. Due to the dangers associated with contact with fentanyl, agents did not field test suspected drugs. The suspected fentanyl was temporarily stored at HIDTA and will be transferred to the DEA's South West Regional

Laboratory ("SWRL"), where it will be tested and the exact weight will be determined.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

34. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

   a) Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

   b) Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

   c) Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In

13

addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

        d) Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

        e) Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[3]

35. As used herein, the term "digital device" includes the SUBJECT DEVICES.

36. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

---

[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

15

who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

  37. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

   a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

   b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

16

38. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

    b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

    c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that

17

appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MORENO-MACHUCA's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of MORENO-MACHUCA's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

39. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

40. For all of the reasons described above, there is probable cause to believe that Rigoberto MORENO-MACHUCA and Oliver RANGEL-ARMENTA have committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this <u>28th</u> day of
<u>October</u>, 2021.

THE HONORABLE STEVE KIM
UNITED STATES MAGISTRATE JUDGE